No. 25-11102

United States Court of Appeals for the Fifth Circuit

ASBURY AUTOMOTIVE GROUP, INCORPORATED; MCDAVID IRVING-HON, L.L.C., doing business as David McDavid Honda of Irving; MCDAVID FRISCO-HON, L.L.C., doing business as David McDavid Honda of Frisco; ASBURY FT. WORTH FORD, L.L.C., doing business as David McDavid Ford Ft. Worth; ALI BENLI,
Plaintiffs – Appellants,

v.

FEDERAL TRADE COMMISSION; LINA M. KHAN, in their official capacity as Commissioner of the Federal Trade Commission; REBECCA KELLY SLAUGHTER, in their official capacity as Commissioner of the Federal Trade Commission; ALVARO BEDOYA, in their official capacity as Commissioner of the Federal Trade Commission; MELISSA A. HOLYOAK, in their official capacity as Commissioner of the Federal Trade Commission; ANDREW FERGUSON, in their official capacity as Commissioner of the Federal Trade Commission,
Defendants – Appellees.

Appeal from the United States District Court for the Northern District of Texas

# Brief of Asbury Plaintiffs-Appellants

Edward D. ("Ed") Burbach
John Sepehri
Brandon M. Livengood
Foley & Lardner LLP
600 Congress, Suite 3000
Austin, Texas 78701
Tel: 512.542.7000

Stacy R. Obenhaus
Foley & Lardner LLP
2021 McKinney, Suite 1600
Dallas, Texas 75201
Tel: 214.999.3000

Counsel for Asbury Plaintiffs-Appellants

*Asbury Automotive Group v. FTC, No. 25-11102*

## Certificate of Interested Persons

The undersigned counsel certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made so that the judges of this court may evaluate possible disqualification or recusal.

| **Plaintiffs-Appellants:** | **Counsel:** |
|---|---|
| Asbury Automotive Group, Inc.<br><br>McDavid Irving-Hon, LLC d/b/a David McDavid Honda of Irving<br><br>McDavid Frisco-Hon, LLC, d/b/a David McDavid Honda of Frisco<br><br>Asbury Ft. Worth Ford, d/b/a David McDavid Ford of Ft. Worth<br><br>Ali Benli | Ed Burbach<br>John Sepehri<br>Stacy Obenhaus<br>Todd Murray<br>Rob Johnson<br>Brandon Livengood<br>Foley & Lardner LLP |
| **Defendants-Appellees:** | **Counsel:** |
| Federal Trade Commission<br><br>Andrew N. Ferguson, in his official capacity as Commissioner of the Federal Trade Commission<br><br>Mark R.Meador, in his official capacity as Commissioner of the Federal Trade Commission | Daniel Aguilar<br>Isaac Belfer<br>U.S. Department of Justice |

*/s/ John Sepehri*
John Sepehri

# Statement Regarding Oral Argument

Because this appeal presents issues arising in an evolving area of the law—the intersection of federal administrative law and federal constitutional law—and because this Court's ruling may carry significant implications regarding federal agency actions, oral argument should materially assist the Court in resolving the issues presented.

# Table of Contents

Certificate of Interested Persons .......... 2

Statement Regarding Oral Argument .......... 3

Table of Contents .......... 4

Index of Authorities .......... 6

Jurisdictional Statement .......... 12

Statement of Issues .......... 13

Statement of the Case .......... 14

I. Introduction .......... 14

II. Statement of Facts .......... 15

III. Procedural History and Rulings Presented for Review .......... 17

Summary of Argument .......... 18

Argument .......... 21

I. Standard For Preliminary Injunctive Relief And Standard Of Review .21

II. Asbury Is Likely to Succeed on the Merits of All Claims .......... 22

A. The district court erred in requiring Asbury to prove injury flowing from the Article II violations. .......... 22

B. This Court's SpaceX decision establishes that the FTC ALJ removal protections violate the Constitution. .......... 24

C. The FTC's Article II arguments below have no merit. .......... 25

1. Addressing severance of removal protections is improper when determining whether to issue a preliminary injunction. .......... 25

2. It does not matter that the FTC moved to dismiss Asbury's claims. .......... 26

3. The FTC's substantive severability analysis is wrong. .......... 27

D. The analysis is generally the same for Asbury's Article II claim regarding the FTC Commissioners. .......... 38

E. This Court's *Intuit v. FTC* opinion establishes the validity of Asbury's Article III claim. .......... 40

1. Intuit involved internally adjudicated deceit claims similar to the deceit claims the FTC asserts against Asbury. .......... 40

2. Intuit's analytical framework squarely addresses Article III claims such as Asbury asserts here. .......... 43

3. This Court concluded that the FTC's allegations against Intuit invoked private rights—so the same is true in the present case. .......... 44

4. The FTC's counter-arguments have no merit. .......... 51

F. The district court used the wrong legal framework for analyzing Asbury's Seventh Amendment claim. .......... 56

G. The district court disregarded a key structural deficiency undergirding Asbury's due process claim. .......... 59

III. *SpaceX* Establishes Asbury Will Suffer Irreparable Harm Sans an Injunction .......... 61

IV. *SpaceX* Confirms That This Record Establishes The Final Two Injunction Elements. .......... 62

Conclusion .......... 64

Certificate of Compliance .......... 66

# Index of Authorities

## Cases

*Alaska Airlines, Inc. v. Brock*,
480 U.S. 678 (1987) ........ 27

*American Airlines v. North American Airlines*,
351 U.S. 79 (1956) ........ 56

*Asbury Auto. Group, Inc. v. FTC*,
No. 4:24-cv-00950-O, 2025 WL 2317455(N.D. Tex. Aug. 11, 2025) ........ 22

*Atlas Roofing Co. v. Occupational Safety and Health Rev. Comm'n*,
430 U.S. 442 (1977) ........ 22

*AT&T, Inc. v. FCC*,
149 F.4th 491 (5th Cir. 2025) ........ 54

*Aunt Bertha v. NLRB*,
No. 4:24-cv-00798-P, 2024 WL 4202383 (N.D. Tex. Sept. 16, 2024) ........ 33

*Axon Enter., Inc. v. FTC*,
598 U.S. 175 (2023) ........ passim

*Ayotte v. Planned Parenthood of N. New England*,
546 U.S. 320 (2006) ........ 32, 33

*Butz v. Economou*,
438 U.S. 478 (1978) ........ 29

*Career Colleges & Schs. of Tex. v. U.S. Dep't of Educ.*,
98 F.4th 220 (5th Cir. 2024) ........ 21

*Chacon v. Granata*,
515 F.2d 922 (5th Cir. 1975) ........ 62

*Cmty. Fin. Servs. Ass'n v. CFPB*,
104 F.4th 930 (5th Cir. 2024) ........ 23

*Cmty. Fin. Servs. Ass'n v. CFPB*,
51 F.4th 616 (5th Cir. 2022) ........ 23

*Collins v. Yellen*,
594 U.S. 220 (2021) ....................14, 22

*Cochran v. SEC*,
20 F.4th 194 (5th Cir. 2021) .................... 24

*Crowell v. Benson*,
285 U.S. 22 (1932) .................... 55

*Def. Distributed v. Bruck*,
30 F.4th 414 (5th Cir. 2022) ....................21

*Doe v. Martin*,
(1790) 4 TR 39, 66–67 ....................48

*Free Enter. Fund v. PCAOB*,
561 U.S. 477 (2010) ....................27, 31, 32, 35

*FTC v. Direct Mktg. Concepts, Inc.*,
569 F. Supp. 2d 285 (D. Mass. 2008) ....................49

*FTC v. QT, Inc.*,
448 F.Supp.2d 908 (N.D.Ill.2006) ....................48, 49

*FTC v. Standard Educ. Soc.*,
302 U.S. 112 (1937) .................... 52

*FTC v. Tashman*,
318 F.3d 1273 (11th Cir.2003) ....................48

*FTC v. Urological Group, Inc.*,
645 F. Supp. 2d 1167 (N.D. Ga. 2008) ....................49

*FTC v Wyndham Worldwide Corp.*,
799 F.3d 236 (3rd Cir. 2105) ....................49, 50

*Granfinanciera SA v. Nordberg*,
492 U.S. 33 (1989) ....................44

*Holloway v. Bristol-Myers Corp.*,
485 F.2d 986 (D.C. Cir. 1973) ....................48

*Illumina v. FTC*,
88 F.4th 1036 (5th Cir. 2023) ....................59, 60

*Impax Labs v. FTC*,
994 F.3d 484 (5th Cir. 2021) .......... 58

*In re Abbott*,
117 F.4th 729 (5th Cir. 2024) .......... 59

*Intuit, Inc. v. FTC*,
No. 24-60040, 2026 WL 787527 (5th Cir. Mar. 20, 2026) .......... passim

*Intuit, Inc.*,
2022 WL 1044862 (F.T.C. Mar. 28, 2022) .......... 46, 47, 48

*Janvey v. Alguire*,
647 F.3d 585 (5th Cir. 2011) .......... 21

*Jarkesy v. SEC*,
34 F.4th 446 (5th Cir. 2022) .......... passim

*Jarkesy v. SEC*,
603 U.S. 109 (2024) .......... passim

*Kraft, Inc. v. FTC*,
970 F.2d 311 (7th Cir. 1992) .......... 48

*Lewis v. Casey*,
518 U.S. 343 (1996) .......... 37

*LIA Network v. City of Kerrville*,
163 F.4th 147 (5th Cir. 2025) .......... 21

*Lucia v. SEC*,
585 U.S. 237 (2018) .......... 28

*Murphy v. NCAA*,
584 U.S. 453 (2018) .......... 28, 29

*Occupational Safety and Health Rev. Comm'n*,
430 U.S. 442 (1977) .......... 44

*Rest. L. Ctr. v. U.S. Dep't of Lab.*,
66 F.4th 593 (5th Cir. 2023) .......... 21

*Schlesinger v. Reservists Comm. to Stop the War*,
418 U.S. 208 (1974) .......... 37

*Seila Law LLC v. CFPB*,
591 U.S. 197 (2020) .......... 27, 35

*Slaughter v. Trump*,
146 S. Ct. 18 (2025) .......... 38, 39

*Slaughter v. Trump*,
791 F. Supp. 3d 1 (D.D.C. 2025) .......... 38, 39, 44

*SO Apartments, LLC v. City of San Antonio*,
109 F.4th 343 (5th Cir. 2024) .......... 64

*Space Expl. Techs Corp. v. NLRB*,
741 F. Supp. 3d 630 (W.D. Tex. 2024) .......... 33

*Space Expl. Techs. Corp. v. NLRB*,
151 F.4th 761 (5th Cir. 2025) .......... passim

*Spann v. JC Penney Corp.*,
No. SA CV 12–0215 FMO (RNBx), 2015 WL 1526590 (C.D. Cal. Mar. 17, 2015) .......... 26

*Stern v. Marshall*,
564 U.S. 462 (2011) .......... 43

*Thunder Basin Coal Co. v. Reich*,
510 U.S. 200 (1994) .......... 60

*Tull v. U.S.*,
481 U.S. 412 (1987) .......... 57

*United States v. Bonilla-Romero*,
984 F.3d 414 (5th Cir. 2020) .......... 28, 37

*United States v. Reese*,
92 U.S. 214 (1875) .......... 32

*Walmart Inc. v. Chief Admin. Law Judge*,
144 F.4th 1315 (11th Cir. 2025) .......... 27, 36, 37

*Wulferic LLC v. FDA*,
793 F. Supp. 3d 830 (N.D. Tex. 2025) .......... 63

## Statutes

U.S. Const. art. II ........ passim
U.S. Const. art. III ........ passim
U.S. Const. amend. V ........ passim
U.S. Const. amend. VII ........ passim
5 U.S.C. § 1202 ........ 30, 34
5 U.S.C. § 3105 ........ 32
5 U.S.C. § 7521 ........ passim
15 U.S.C. § 21 ........ 58
15 U.S.C. § 41 ........ 25
15 U.S.C. § 45 ........ 41, 48, 58
15 U.S.C. § 52 ........ 48
15 U.S.C. § 53 ........ 36
15 U.S.C. § 55 ........ 48
28 U.S.C. § 1292 ........ 12, 17
28 U.S.C. § 1331 ........ 12
28 U.S.C. § 2107 ........ 12
Civil Service Reform Act of 1978, Pub. L. No. 95-454, §§ 1202, 1204, 92 Stat. 1111 (1978) ........ 31

## Rules

Fed. R. App. P. 4 ........ 12
Fed. R. App. P. 32 ........ 66
Fed. R. App. P. 32 ........ 66

## Regulations

5 C.F.R. § 1200.1 .......................................................................................30

16 C.F.R. § 3.31A .......................................................................................60

## Other Authorities

Charles Alan Wright & Arthur R. Miller, 5B Federal Practice & Procedure § 1357 (3d ed. 2004) ........................................................................... 27

Civil Service Reform: Hearings on H.R. 11280, 95th Cong. 824 (1978) .....30

Linda D. Dellum, *"You're Fired!" Why the ALJ Multi-Track Dual Removal Provisions Violate the Constitution and Possible Fixes*, 26 GEO. MASON L. REV. 705, 707 (Spring 2019)................................................................29, 32

S. Rep. No. 95-969 (1978) ............................................................................30

## Jurisdictional Statement

The plaintiffs filed a complaint in the district court seeking declaratory and injunctive relief and asserting that Federal Trade Commission (the "FTC") agency proceedings against them violated articles II and III of the U.S. Constitution as well as the Seventh and Fifth Amendments to the Constitution. ROA.16-48. The action arises under the constitution and laws of the United States, so the district court had federal question jurisdiction. *See* 28 U.S.C. § 1331; *Axon Enter., Inc. v. FTC*, 598 U.S. 175 (2023).

The plaintiffs sought a preliminary injunction. ROA.69-71. On August 11, 2025, the district court entered its order denying the plaintiffs' request for a preliminary injunction. ROA.689-710. On September 26, 2025, the plaintiffs filed their notice of appeal. ROA.767. Because the FTC is a United States agency and a party to the case, the notice of appeal was timely. *See* 28 U.S.C. § 2107(b)(2); Fed. R. App. P. 4(a)(1)(B). Because the order the plaintiffs appeal is an interlocutory order refusing an injunction, this Court has jurisdiction pursuant to 28 U.S.C. § 1292(a)(1).

## Statement of Issues

The question is whether the district court abused its discretion when it refused the plaintiffs' request for a preliminary injunction to enjoin the FTC agency proceedings against these parties. The issues are:

1. Do the proceedings violate (a) article II of the U.S. Constitution; (b) article III of the U.S. Constitution; (c) the Fifth Amendment right to due process, or (d) the Seventh Amendment right to a jury trial?

2. Is a preliminary injunction halting the FTC agency proceedings a proper remedy?

# Statement of the Case

## I. INTRODUCTION

This case concerns interwoven constitutional issues that lie at the heart of the framers' efforts to protect private parties from an overweening central government. Specifically, this case concerns the FTC's efforts to adjudicate private rights under a structurally biased regime that is presided over by an executive branch officer improperly shielded from removal by the President.

Supreme Court Justice Neil Gorsuch wrote:

> In the case of a removal defect, a wholly unaccountable government agent asserts the power to make decisions affecting . . . lives, liberty, and property. . . . Few things could be more perilous to liberty than some "fourth branch" that does not answer even to the one executive official who is accountable to the body politic.

*Collins v. Yellen*, 594 U.S. 220, 278-79 (2021) (Gorsuch, J., concurring in part)(citations omitted). As Justice Gorsuch explains more recently:

> The Seventh Amendment's jury-trial right operates together with Article III and the Due Process Clause of the Fifth Amendment to limit how the government may go about depriving . . . life, liberty, or property. The Seventh Amendment guarantees the right to trial by jury. Article III entitles . . . an independent judge who will preside over that trial. And due process promises any trial will be held in accord with time-honored principles. Taken together, all three provisions vindicate the Constitution's promise of a "fair trial in a fair tribunal."

*Jarkesy v. SEC*, 603 U.S. 109, 141 (2024) (Gorsuch, J., concurring).

That promise is threatened by the FTC's administrative enforcement action at issue in this case if it is not enjoined before it substantially proceeds. Recent precedent of the Supreme Court and this Court validates Supreme Court Justice Clarence Thomas' warnings that the "appellate review model" of agency adjudication raises "serious constitutional concerns" because:

> [That model] may violate the separation of powers by placing adjudicatory authority over core private rights—a judicial rather than executive power—within the authority of Article II agencies . . . . It may violate Article III by compelling the Judiciary to defer to administrative agencies regarding matters within the core of the Judicial Vesting Clause . . . . And, it may violate due process by empowering entities that are not courts of competent jurisdiction to deprive citizens of core private rights . . . . Finally, the appellate review model may run afoul of the Seventh Amendment by allowing an administrative agency to adjudicate what may be core private rights without a jury . . . .

*Axon Enters., Inc. v. FTC*, 598 U.S. 175, 202 (2023) (Thomas, J., concurring) (citations omitted). The present case squarely presents these issues.

## II. Statement of Facts

The FTC issued a civil investigative demand against Asbury Automotive Group Inc. and several of its affiliates—referred to throughout this brief collectively as "Asbury." ROA.17. Asbury owns and operates a network of motor vehicle dealerships and employs the individuals who work at these dealerships. ROA.26. For about two years, Asbury responded to extensive document requests and ultimately produced nearly 10,000 items to the FTC. ROA.20.

Eight months later, the FTC threatened an administrative proceeding unless Asbury agreed to a consent order conceding that its business practices were deceptive and requiring that Asbury pay restitution and fines. ROA. 32. The parties' negotiations regarding the matter were unfruitful. ROA.33. In April and May 2024, Asbury and its counsel met by video conference with each of the five FTC Commissioners then holding office to discuss the FTC allegations. ROA.33. Asbury submitted materials explaining why it did not believe it had committed the alleged violations; requested information that supported the FTC allegations; offered to correct any actual violations; and urged the Commissioners not to file a complaint. ROA.34.

Despite these efforts, the FTC initiated the administrative proceeding at issue in the present lawsuit, *In re Asbury Automotive Group, Inc.*, No. D-9436 (FTC Aug. 16, 2024) (the "FTC Proceeding"). ROA.143-54. The complaint alleged that Asbury and Benli[1] violated the Federal Trade Commission Act by making false/misleading misrepresentations to consumers regarding charges for "add-ons" to vehicle sales contracts who were thereby required to buy one or more add-ons that they were not required to buy; and by charging consumers for add-ons without obtaining express and informed consent. ROA.143-54. The FTC complaint also

[1] Asbury and Benli are hereafter collectively referred to as "Asbury".

asserted a claim under the Equal Credit Opportunity Act, but the FTC dropped the claim after this lawsuit was filed. *See* https://www.ftc.gov/system/files/ftc_gov/pdf/d09436_asbury_auto_order_amending_complaint.pdf (accessed Apr. 21, 2026). Asbury filed an answer denying the allegations and asserting various defenses. ROA.623-24.

## III. Procedural History and Rulings Presented for Review

Asbury promptly filed the present lawsuit; it sought declaratory relief that the FTC Proceeding violates Articles II and III, as well as the Fifth and Seventh Amendments, of the U.S. Constitution, and Asbury sought judgment permanently enjoining the FTC Proceeding. ROA.16-48.

The FTC filed a Rule 12(b) motion to dismiss the complaint. ROA.370-406. Asbury filed a motion for a preliminary injunction. ROA.69-71. The district court denied the request for injunction and dismissed all but one of Asbury's claims—the Article III claim. ROA.709-10. Based on a subsequent opinion from this Court, Asbury sought partial reconsideration. ROA.768-804. Asbury also appealed the ruling. ROA.767. The district court declined to reconsider its ruling while this appeal is pending. ROA.877-78.

Asbury seeks review of the district court's refusal to grant the request for preliminary injunctive relief. ROA.689-710. *See* 28 U.S.C. § 1292(a)(1).

## Summary of Argument

Under this Court's opinion in *Space Exploration Tech. Corp. v. NLRB* [hereinafter, sometimes "*SpaceX*"], the district court abused its discretion in denying Asbury's request for preliminary injunctive relief enjoining the FTC Proceeding. *SpaceX* holds that litigants challenging removal protections for executive officers under Article II of the U.S. Constitution do not need to show that a distinct injury flows from the constitutional violations.

Additionally, *SpaceX* definitively establishes that the removal protections at issue here are unconstitutional and precludes courts from considering, at the preliminary injunction stage, whether *severance* of the unconstitutional removal protections is an appropriate remedy. But even if it were appropriate to substantively consider severance as a remedy at this juncture, severance would be unworkable and improper here, as it would usurp Congress' role by substantially reworking the statutory schemes against Congress' expressed legislative intent.

Based on this Court's very recent opinion in *Intuit, Inc. v. FTC* and the opinions in *Jarkesy v. SEC* by this Court and the Supreme Court, the district court also abused its discretion in denying a preliminary injunction with regard to Asbury's claims under Article III of the Constitution. This is because the above authorities establish that the FTC seeks to

*administratively* adjudicate Asbury's *private* rights, rights that ordinarily must be *judicially* adjudicated in an Article III tribunal. More specifically, the cases demonstrate that claims such as the ones the FTC asserts are closely analogous to claims for fraud and deceit in equity and thus involve private rights. Moreover, *Intuit* and *Jarkesy* show that the FTC Proceeding does not invoke the so-called "public rights" exception to Article III adjudication of private rights.

These same authorities further demonstrate that the district court erred in its analysis of Asbury's Seventh Amendment claim. This is because they reflect that the FTC's claims are also closely analogous to claims of fraud and deceit at common law. Under the Seventh Amendment, claims at common law must be tried before a jury. And for the same reasons the public rights exception does not apply to Asbury's Article III claim, it does not apply to the Seventh Amendment claim.

Finally, the District Court committed legal error when it did not consider that Asbury's due process claim includes a structural challenge based on the inherent facial unfairness of the FTC's procedural rules.

As a result, Asbury established the most important element of the preliminary injunction standard—likelihood of success on the merits.

Asbury also met its burdens on the other elements for a preliminary injunction. First, under *Axon Enterprises* it suffers a "here and now injury" if subjected to an administrative proceeding that is structurally infirm like the FTC Proceeding. Additionally, this Court has held such "*Axon* injury" is irreparable harm for preliminary injunction purposes. Finally, under this Court's precedents, the equities and the public interest, which merge when the government is the defendant, also favor a preliminary injunction.

In short, based on undisputed facts in this record, and based on legal principles that squarely apply to those undisputed facts, Asbury established all requirements for obtaining preliminary injunctive relief.

# Argument

## I. STANDARD FOR PRELIMINARY INJUNCTIVE RELIEF AND STANDARD OF REVIEW

In this appeal, Asbury challenges the district court's refusal to issue a preliminary injunction. This Court reviews the ruling for abuse of discretion. *LIA Network v. City of Kerrville*, 163 F.4th 147, 160 (5th Cir. 2025). "'A District Court by definition abuses its discretion when it makes an error of law.'" *Def. Distributed v. Bruck*, 30 F.4th 414, 427 (5th Cir. 2022). A district court's "conclusions of law 'are subject to broad review'" *Janvey v. Alguire*, 647 F.3d 585, 592 (5th Cir. 2011).

In determining whether to issue a preliminary injunction, a court must consider four factors: (1) the likelihood of the movant's ultimate success on the merits, (2) a substantial threat of irreparable harm to the movant sans an injunction, (3) the balance of harms to the parties, and (4) the public interest. *See Career Colleges & Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 254 (5th Cir. 2024). Likelihood of success on the merits is considered the most important factor in the equation. See *id.* "The balance-of-harms and public-interest factors merge when the government opposes an injunction." *Id.* at 255. Finally, irreparable harm need only "be more than de minimis." *Rest. L. Ctr. v. U.S. Dep't of Lab.*, 66 F.4th 593, 600 (5th Cir. 2023). Indeed, as discussed in detail *infra* in Sections III and IV of this brief, under *SpaceX*, in

cases involving structural constitutional challenges such as those present here and undisputed material facts, plaintiffs are entitled to an injunction as a matter of law once they have established likelihood of success on the merits.

## II. ASBURY IS LIKELY TO SUCCEED ON THE MERITS OF ALL CLAIMS[2]

### A. The district court erred in requiring Asbury to prove injury flowing from the Article II violations.

The district court denied injunctive relief on Asbury's Article II claims because the court had previously interpreted the Supreme Court's decision in *Collins v. Yellen*, 594 U.S. 220 (2021), to mean "'that relief from agency proceedings involving potentially unconstitutional removal provisions is predicated on a showing that the unconstitutional provision *inflicted compensable harm*.'" ROA.707 (emphasis added). The district court (a) was not persuaded by Asbury's contention that the logic of the U.S. Supreme Court's decision in *Axon Enterprises* obviated a compensable harm showing, and (b) declined to adopt the reasoning of other Texas district courts in that regard in interpreting the *Axon* holding. ROA.708-09.

However, in an opinion issued shortly after the district court decision herein, this Court definitively clarified that plaintiffs seeking to invalidate an

---

[2] Although Asbury cannot directly challenge the dismissal of several of its claims in this interlocutory appeal, those dismissals were error because the standard to survive a motion to dismiss is that claims are merely "plausible." *See Asbury Auto. Group, Inc. v. FTC*, No. 4:24-cv-00950-O, 2025 WL 2317455, at *3 (N.D. Tex. Aug. 11, 2025) (citation omitted).

agency adjudication based upon unconstitutional removal protections for executive officers *need not show such harm*. As this Court wrote, courts requiring a showing of harm had misconstrued *Collins* and related decisions. *See SpaceX*, 151 F.4th 761, 779 (5th Cir. 2025), *pet. filed*, No. 25-622 (U.S. docketed Dec. 2, 2025). As this Court also stated: "*Collins* governs retrospective relief from final agency action," whereas the plaintiffs challenging the NLRB proceedings sought "to challenge the validity of the ongoing proceeding itself." *See id.* at 780. Furthermore, this Court explained that *Community Financial Services Association v. CFPB*, 51 F.4th 616 (5th Cir. 2022), *rev'd and remanded on other grounds*, 601 U.S. 416 (2024), and *reinstated in part by* 104 F.4th 930 (5th Cir. 2024), "likewise involved retrospective relief from a final rule." *Id.*

By contrast, the NLRB in-house adjudications—like the FTC Proceeding at issue in the present case—"[were] the injury. The harm [was] not downstream from the process—it [was] the process." *SpaceX,* 151 F.4th at 780. Moreover, the injury of the parties seeking to stop the NLRB proceedings filed against them was "*Axon's* injury: the 'here-and-now injury' of 'being subjected to unconstitutional agency authority.'" *Id.*[3] So under

[3] The Court also noted that it has previously stated "that a plaintiff could seek to enjoin ongoing SEC proceedings before ALJs unconstitutionally insulated from removal" because "[t]he plaintiff was not attacking past agency action but seeking 'an administrative adjudication untainted by separation-of-powers violations.'" *Id.* (citing

*SpaceX*, Asbury need not have shown any specific harm flowing from the unconstitutional removal protections for the FTC's ALJs.

### B. This Court's SpaceX decision establishes that the FTC ALJ removal protections violate the Constitution.

In *SpaceX*, this Court began its analysis of the claims against the NLRB by assessing the constitutionality of the removal protections for the NLRB's ALJs. This Court noted that just two years before, in *Jarkesy v. SEC,* it had found unconstitutional nearly identical removal protections for SEC ALJs, whereby the ALJs could be removed only for "good cause," as determined by the U.S. Merit Suspension Board ("MSPB"), and SEC Commissioners and MSPB members themselves could be removed only "for cause." *SpaceX*, 151 F.4th at 774-75. This Court then noted that the same analysis applied to the NLRB ALJs since they too were protected by "at least" two layers. *Id.* at 775.

As the district court recognized in its order denying Asbury's requested relief, the same multi-layered removal protections exist in the case of the FTC's ALJs. ROA.691. In denying relief, the district court specifically noted that FTC ALJs may only be removed by the MSPB for "good cause" and that per the U.S. Code, the FTC's Commissioners may only "be removed by the President for inefficiency, neglect of duty, or malfeasance in office."

---

*Cochran v. SEC*, 20 F.4th 194 (5th Cir. 2021), *aff'd sub nom.*, 598 U.S. 175 (2023)).

ROA.691 (citing 5 U.S.C. § 7521(a) and 15 U.S.C. § 41) ); *see also* 5 U.S.C. § 7521 & 15 U.S.C. § 41 (Addendums D & E). This Court's opinions in *SpaceX* and *Jarkesy* therefore require this Court to reach the same conclusion as to the unconstitutionality of the removal protections for FTC ALJs as it did for SEC ALJs and NLRB ALJs.

### C. The FTC's Article II arguments below have no merit.

#### *1. Addressing severance of removal protections is improper when determining whether to issue a preliminary injunction.*

The FTC argued that the district court could sever unconstitutional ALJ removal protection provisions. ROA.363-364. This Court's opinion in *SpaceX* forecloses that argument. Rejecting the NLRB severance arguments, this Court noted that the plaintiffs in the district court cases before it had—like Asbury did here—sought declaratory judgments invalidating the similar removal provisions at issue and that those requests were not properly before the Court. *SpaceX*, 151 F.4th at 773. This Court concluded that "the severability inquiry [was] premature and belong[ed] to the merits phase, when the court considers final relief. Accordingly, the possibility of severance d[id] not preclude preliminary injunctive relief." *Id.*

The same situation presents itself to this Court now. Asbury appealed an interlocutory order denying a request for preliminary injunctive relief on the Article II claims, relief the district court should have granted because

Asbury had no burden to prove harm beyond "*Axon* injury." Asbury is still seeking declaratory relief in the district court, relief that in the current posture of this case is not properly before this Court. Accordingly, this Court should review and assess Asbury's request for preliminary injunctive relief without addressing whether severance may be a viable final remedy.

*2. It does not matter that the FTC moved to dismiss Asbury's claims.*

The FTC attempted a two-step maneuver around *SpaceX* in connection with the FTC's severance arguments. First, the FTC argued that because it had also moved to dismiss the Article II claim, the district court should leap to the merits of severance in regard to Asbury's claim. ROA.363-64. Second, the FTC argued that if the district court did so, it could not issue an injunction. ROA.363-64. The FTC was and is wrong on both counts.

Critically, although the district court denied Asbury injunctive relief and granted the FTC's motion to dismiss with respect to most of Asbury's claims, the court did not grant the motion to dismiss with respect to Asbury's Article III claim. Even as the case stands at the district court, then, there still exists a possibility of some kind of relief for Asbury. "When a plaintiff states a claim, the appropriate form of relief is not to be decided upon a motion to dismiss." *Spann v. JC Penney Corp.*, No. SA CV 12–0215 FMO (RNBx), 2015 WL 1526590, at *4 (C.D. Cal. Mar. 17, 2015) (quoting CHARLES ALAN WRIGHT

& ARTHUR R. MILLER, 5B FEDERAL PRACTICE AND PROCEDURE § 1357, at 676–77 (3d ed. 2004), writing that it "need not appear that the plaintiff can obtain the particular relief prayed for in the complaint, as long as the district judge can ascertain from what has been alleged that some relief may be granted by the court"). It is telling in this regard that the severance cases that the FTC cited to the district court involved late stages of the cases. *See Seila Law LLC v. CFPB*, 591 U.S. 197, 208-09 (2020); *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 487-88 (2010); *Walmart Inc. v. Chief Admin. Law Judge of Off. Of Chief. Admin. Hearing Officer*, 144 F.4th 1315, 1321 (11th Cir. 2025). So this Court need not now engage in a slippery, substantive severability analysis, an analysis the Supreme Court has suggested is "elusive." *See SpaceX*, 151 F.4th at 773.

*3. The FTC's substantive severability analysis is wrong.*

Even were this case procedurally at a later stage, severance would still be an improper remedy for the Article II violations here. Initially, the Supreme Court has instructed that the "inquiry in evaluating severability is whether the statute will function in a *manner* consistent with the intent of Congress" if the invalid portion alone is voided. *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 685 (1987) (emphasis in original). The inquiry is not merely whether the statute still works after severance; courts cannot sever

statutory language if "'rewrit[ing] [the] statute'" would "'give it an effect altogether different from that sought by the measure viewed as a whole.'" *Murphy v. NCAA*, 584 U.S. 453, 481-82 (2018) (citation omitted). That is, "when a portion of a statute is unconstitutional, 'the traditional rule is that the unconstitutional provision must be severed unless the statute created in its absence is legislation that Congress would not have enacted.'" *United States v. Bonilla-Romero*, 984 F.3d 414, 418 (5th Cir. 2020).

This Court has every reason to conclude that Congress would not have preferred the statutory schemes at issue here if those schemes contained no removal protections. For example, considering the lowest level of protection for FTC ALJs in 5 U.S.C. § 7521 first, "[t]he substantial independence that the Administrative Procedure Act's removal protections provide to administrative law judges is a central part of the Act's overall scheme." *Lucia*, 585 U.S. at 260 (Breyer, J., concurring in part) ); *see also* 5 U.S.C. § 7521 (Addendum D). As former Supreme Court Justice Stephen Breyer explained:

> Before the Administrative Procedure Act, hearing examiners "were in a dependent status" to their employing agency, with their classification, compensation, and promotion all dependent on how the agency they worked for rated them . . . . As a result of that dependence, "[m]any complaints were voiced against the actions of the hearing examiners, it being charged that they were mere tools of the agency concerned and subservient to the agency heads in making their proposed findings of fact and

> recommendations . . ." The [APA] responded to those complaints by giving administrative law judges "independence and tenure within the existing Civil Service system."

*Id.* (citations omitted). Along with this independence, Congress gave ALJs "powers . . . comparable to those of a trial judge." *Butz v. Economou,* 438 U.S. 478, 513 (1978). If ALJ removal protections are severable, then the officials overseeing agency adjudications would be simultaneously equipped with judicial powers but also subordinate to executive branch whims. Far from "preserving the independent judgment of these men and women," *Butz*, 438 U.S. at 514, such a dynamic would leave ALJs—with their judicial powers—subject to the very executive-branch pressures the APA sought to eliminate. That is, "[i]f a court were to invalidate the ALJ removal protection layer, the [supposed] independence and impartiality of administrative hearings would be lost. The system would return to . . . days, when hearing examiners were considered mere instruments of their agencies." Linda D. Dellum, *"You're Fired!" Why the ALJ Multi-Track Dual Removal Provisions Violate the Constitution and Possible Fixes*, 26 GEO. MASON L. REV. 705, 707 (Spring 2019) [hereinafter "Dellum"]. Because such results are "exactly backwards" as to Congress' intent, *Murphy*, 584 U.S. at 483, the ALJs' tenure protections may not be severed from the conferral of ALJ authority.

Congress also would not want courts to sever the removal protection for members of the MSPB found in 5 U.S.C. § 1202 because it, too, is central to the statutory scheme. As is explained in the Senate Governmental Affairs Committee Report on the Civil Service Reform Act of 1978:

> There is little doubt that a vigorous protector of the Merit Systems is needed. The lack of adequate protection was painfully obvious during the civil service abuses only a few years ago. Establishment of a strong and independent board and special counsel will discourage subversions of merit principles. Dwight Ink, Executive Director of the President's Personnel Management Study, called the independent and strong merit board "the *cornerstone*" of civil service reform.

S. Rep. No. 95-969, at 6-7 (1978) (emphasis added) ); *see also* 5 U.S.C. § 1202 (Addendum A). Because the statute allows MSPB members to be removed only for cause, the committee report noted that the "board should be insulated from the kind of political pressures that have led to violations of merit principles in the past." *Id.* at 7; *see* 5 C.F.R. § 1200.1 ("The [MSPB] is an independent Government agency that operates like a court.")(Addendum G). In fact, the removal provision shielding MSPB members was *explicitly designed* to "*ensure*[] that the [MSPB] will be independent of the direction and control of the President." *See* S. Rep. No. 95-969, at 29 (emphasis added); *see also Civil Service Reform: Hearings on H.R. 11280*, 95th Cong. 824 (1978) (reflecting Congress' concern that MSPB members would be vulnerable to political "pressure" absent removal protections). To allay these

concerns, Congress crafted the present multi-layer tenure regime. Civil Service Reform Act of 1978, Pub. L. No. 95-454, §§ 1202, 1204, 92 Stat. 1111, 1121-1122, 1137 (1978) (Addendums A – B).

The same type of concerns informed Congress' design of the FTC. As the Supreme Court has opined, "the FTC was designed to be 'independent in character,' 'free from 'political domination or control,' and not 'subject to anybody in the government' or 'to the orders of the President.'" *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 502 (2010) (citation omitted). Accordingly, in this overall multi-layered and multi-statutory independence scheme with more than one layer of insulation from Presidential control for FTC ALJs not lending itself to the Court as a candidate for a severance, choosing one over another for such a candidacy is a fraught judicial task. *See id.* at 545 (Breyer, J., dissenting)(citations omitted)(noting that "'the touchstone' of the severability analysis 'is legislative intent ,' and Congress has repeatedly expressed its judgment 'over the last century that it is in the best interest of the country, indeed essential, that federal service should depend upon meritorious performance rather than political service.'").

Another aspect of why courts should be wary of supplanting their own views for Congress' by severing removal protections is that severance would affect more than just FTC ALJs. As one legal scholar has described it:

> [U]nlike cases in which the courts have found removal provisions violate the Constitution and have severed the offending provisions, here, there is no easy fix. Federal statute 5 U.S.C § 7521 protects ALJs from at-will removal, reductions in pay or pay grade, suspensions, and furloughs. It applies to all ALJs who are appointed under 5 U.S.C. § 3105. Hence, [a] [c]ourt's holding has the potential to affect all ALJs: those working for independent agencies . . . and those working for executive agencies . . . .

*Dellum*, at 707 (citations omitted); *see also* 5 U.S.C. § 3105 (Addendum C). In other words, severing ALJ protections could well have much farther-reaching impact than severing other removal protections. That, too, makes addressing the constitutional infirmity of the multi-layer removal protections here a job for Congress.

It is thus not possible for any court to determine a severance path that Congress would have deemed appropriate to remedy the constitutional defects with the FTC's structure. To do so in the face of Congress' expressed intent that ALJs, MSPB members, and agency commissioners would remain independent and free of Presidential control would improperly circumvent Congress. *See Free Enter. Fund*, 561 U.S. at 510 (explaining that "editorial freedom" to remedy the statutory frameworks for unconstitutional removal provisions "belongs to the Legislature, not the Judiciary."). Severance here would "substitute the judicial for the legislative department of the government." *United States v. Reese*, 92 U.S. 214, 221 (1875); *see also Ayotte*

*v. Planned Parenthood of N. New England*, 546 U.S. 320, 330 (2006) (noting that "the touchstone for any decision about remedy is legislative intent, for a court cannot 'use its remedial powers to circumvent the intent of the legislature.'"). Courts should "restrain [themselves] from 'rewrit[ing] [the] law to conform it to constitutional requirements'" in the face of so much evidence Congress would not approve. *Ayotte*, 546 U.S. at 329.

Judges presiding over two cases consolidated into *SpaceX* recognized these same substantive problems. One wrote:

> The NLRB ALJ conducting the administrative proceedings against SpaceX has three sets of removal protections, and it is not clear which, if any, Congress would be willing to give up. The removal protections that the APA gives to ALJs are 'a central part of the Act's overall scheme' to protect against the troubling questions that arise from an agency's commingling of adjudicative and prosecutorial functions . . . . Congress designed the NLRB to be an independent agency insulated from presidential control . . . . And finally, to further insulate the ALJs, Congress created the MSPB in the Civil Service Act of 1978 . . . , and enacted provisions designed to 'confer upon [MSPB] members a tenure akin to that of the Federal judiciary . . .'
>
> While statutes are severable if 'the remainder of the law is capable of functioning independently and thus would be fully operative as a law,' doing so here would circumvent the legislature without clear congressional intent . . . . Here there is no appropriate way to sever any of the removal protections . . . .

*Space Expl. Techs Corp. v. NLRB*, 741 F. Supp. 3d 630, 639 (W.D. Tex. 2024) (citations omitted), *aff'd*, 151 F.4th 761 (2025); *see also Aunt Bertha v.*

*NLRB*, No. 4:24-cv-00798-P, 2024 WL 4202383, at *3 (N.D. Tex. Sept. 16, 2024), *aff'd*, 151 F.4th 761 (2025).

Finally, this Court has already effectively answered the question as to whether severance of any single layer of protection for FTC ALJs would be enough to make them sufficiently accountable to the President. In *Jarkesy*, the SEC urged this Court "to interpret the for-cause protections for ALJs to instead allow removal for essentially any reason." *Jarkesy v. SEC*, 34 F.4th 446, 465 (5th Cir. 2022), *aff'd*, 603 U.S. 109 (2024). Yet this Court declined to effectively read out of the statute the "for cause" protection for ALJs:

> Even if we could do so . . ., that would not solve the Article II problem . . . . [T]he MSPB is part of the mix as well. Furthermore, MSPB members 'may be removed by the President only for inefficiency, neglect of duty, or malfeasance in office.' 5 U.S.C. § 1202(d). So, for an SEC ALJ to be removed, the MSPB must find good cause and the Commission must choose to act on that finding. And members of both the MSPB and the Commission have for-cause protection from removal by the President. Simply put, if the President wanted an SEC ALJ to be removed, at least two layers of for-cause protection stand in the President's way.
>
> Thus, SEC ALJs are sufficiently insulated from removal that the President cannot take care that the laws are faithfully executed. The statutory removal restrictions are unconstitutional.

*Id.* at 465. Whether a court formally severed a layer of "for cause" protection here (such as the lowest layer shielding the FTC's ALJs) or simply interpreted that layer to provide no protection to the FTC's ALJs, the ALJs would still have two layers of protection, and Asbury would still be subjected to an

illegitimate decisionmaker still "safely encased within a Matryoshka doll of tenure protections." *See Free Enter. Fund*, 561 U.S. at 497.

Additionally, the key cases the FTC cited below to support severance here (*see* ROA.363-64) are materially different from the present case. In *Free Enterprise Fund*, the Supreme Court's severance of the protection at issue left just one layer of removal protections between the President and the PCAOB members. *Free Enter. Fund*, 561 U.S. at 508-10. In *Selia Law*, "[t]he only constitutional defect [the Supreme Court] . . . identified in the CFPB's structure is the Director's insulation from removal," and "[i]f the Director were removable at will by the President, the constitutional violation . . . disappear[ed]." *Seila Law*, 591 U.S. at 235. In both these cases, the issue boiled down to whether Congress would have preferred regulatory agencies without independence to no regulatory agencies. *See Free Enterprise Fund*, 561 U.S. at 509; *Seila Law*, 591 U.S. at 235.

The circumstances in this case are markedly different. Here, this Court confronts two and even three layers of insulation for FTC ALJs so that the choice of severance to arrive at a constitutionally permissible level of only one layer is difficult. *Seila Law*, 591 U.S. at 204. Additionally, if this Court does not sever the protections for ALJs and MSPB members, the substantive regulatory agency does not disappear. There is no cataclysm created by

declining to sever here because the FTC pursues enforcement actions against parties in federal court[4] and often with state attorneys general.[5]

*Walmart* is even less persuasive. For one thing, the opinion is an out-of-circuit case, and its conclusion that the ALJ removal protection at issue is constitutional is at odds with this Court's views. Indeed, the Eleventh Circuit explicitly disagreed with this Court. *See Walmart*, 144 F.4th at 1343 (stating that the majority opinion in *Jarkesy* "*incorrectly concluded* that SEC ALJs 'perform[ed] substantial executive functions'" (emphasis added)).

Furthermore, the Eleventh Circuit repeatedly emphasized that the U.S. Attorney General had plenary authority over the ALJ at issue and that the Attorney General is removable at will by the President. *Walmart*, 144 F.4th at 1343 ("*[C]ritically here*, . . . the adjudicative decisions made by the Department's ALJs in OCAHO are subject to direct and plenary review by a higher official *who can be removed at will by the President*." (emphasis added)). Indeed, in making its severance "observation," the Eleventh Circuit wrote that if it were "to find the removal protection unconstitutional, [it]

---

[4] *See* https://www.ftc.gov/about-ftc/mission/enforcement-authority (last visited April 14, 2026) (with regard to consumer protection and judicial enforcement, noting that "Section 13(b) of the FTC Act, 15 U.S.C. Sec. 53(b), authorizes the Commission to seek preliminary and permanent injunctions to remedy 'any provision of law enforced by the Federal Trade Commission'").

[5] *See, e.g.*, https://www.ftc.gov/news-events/news/press-releases/2024/04/ftc-issues-report-congress-collaboration-state-attorneys-general (last visited April 14, 2026).

need only sever *one level* of protection and leave the Department's ALJs *removable at will by the Attorney General, who also is removable at will*." *Id.* at 1348-49 (emphasis added). There is no such authority over FTC ALJs removable at will by the President.

Perhaps recognizing the weakness of the cases it cited, the FTC invited the district court to defy *SpaceX*. The FTC argued that "*SpaceX* could not have overruled Supreme Court precedent establishing that where severance would be the appropriate final remedy, a plaintiff is not entitled to an injunction . . . against administrative proceedings, which would afford a greater remedy than what it would obtain at final judgment." ROA.363-64. But the cases cited establish no such thing, as two of them have nothing to do with severance in the injunction context or otherwise. Rather, those cases expound on the idea that the plaintiffs had to show injury in fact to press their claims. *See, e.g., Lewis v. Casey*, 518 U.S. 343, 348-49, 356-59 (1996); *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 220–22 (1974). And the third case pertains to how a court should narrowly apply a severance remedy. *See Bonilla-Romero*, 984 F.3d at 419 ("Thus, excising the mandatory minimum nature of the life sentence is all that is needed to satisfy the constitutional issue . . . .").

Finally, the FTC incorrectly dismissed *Jarkesy*'s instructiveness. By rejecting an invitation "to interpret the for-cause protections for ALJs to . . . allow removal for essentially any reason," this Court highlighted that there are not just one, but two layers of removal protections in circumstances such as those present here needing severance to reach a constitutionally valid status. *See Jarkesy* F.4th at 465. By downplaying that, the FTC thus tempted the district court to improperly act as a legislative body.

**D. The analysis is generally the same for Asbury's Article II claim regarding the FTC Commissioners.**

Importantly, the Department of Justice no longer defends as constitutional the type of removal protections at issue in this case. *See, e.g.*, https://www.hklaw.com/en/insights/publications/2025/03/doj-forsakes-defending-the-alj-process-against-article-ii-challenges (last visited Apr. 12, 2026). In fact, the injunction analysis is similar regarding Asbury's Article II claim as respects the FTC Commissioners. The FTC of 2026 is not the FTC of 1935, and courts should therefore analyze challenges to the FTC Commissioners' removal protections in light of present facts. Recently, the Supreme Court has signaled as much with respect to *Slaughter v. Trump*, 146 S. Ct. 18 (2025), *granting cert. before judgment from*, 791 F. Supp. 3d 1 (D.D.C. 2025). In that lawsuit, the district court granted Slaughter's motion

seeking a declaration that President Trump was not entitled to remove her from her office as an FTC Commissioner. *See id.* at 24.

After some action in the D.C. Circuit, and a stay of the district court's order by Chief Justice Roberts, the full Supreme Court subsequently granted the application for stay referred to it by the Chief Justice and treated the stay application as a petition for writ of certiorari before judgment, which the Court granted. 146 S. Ct. at 18. Furthermore, the Court directed the parties to brief: "(1) Whether the statutory removal protections for members of the Federal Trade Commission violate the separation of powers and, if so, whether *Humphrey's Executor v. United States* . . . should be overruled" and "(2) Whether a federal court may prevent a person's removal from public office, either through relief at equity or at law." *Id.* The case has been orally argued and is pending, but this Court should consider granting Asbury's preliminary injunction request on its Article II claim as it pertains to the FTC Commissioners as well, given the clear signal from the Supreme Court. There is no need for a harm showing; there is no question the FTC commissioners are "officers" of the United States; and severability analysis is premature for the reasons explained *supra* with regard to FTC ALJs.

### E. This Court's *Intuit v. FTC* opinion establishes the validity of Asbury's Article III claim.

With respect to Asbury's Article III claim, the district court denied the request for injunctive relief but concluded: (a) that it was "plausible" that the FTC Proceeding implicates private rights in equity that generally require an Article III tribunal, and (b) that the FTC had "not overcome the presumption in favor of Article III" to implicate "the public rights exception" to that general rule. ROA.705-06. The district court also concluded that Asbury's Article III argument was "novel" and presented "a thorny question [that] should be decided at the summary-judgment stage of proceedings." ROA.705. The court stated that additional briefing in the context of summary judgment proceedings would be helpful and could alter its "determination that Article III is implicated, or the public rights exception does not apply." ROA.706.

Thanks to this Court's more recent opinion in *Intuit, Inc. v. FTC*, No. 24-60040, 2026 WL 787527 (5th Cir. Mar. 20, 2026), Asbury's arguments may no longer be characterized as novel. *Intuit* confirms that Asbury will succeed on the merits of its Article III claim.

#### *1.* Intuit *involved internally adjudicated deceit claims similar to the deceit claims the FTC asserts against Asbury.*

"In 2022, [the] FTC issued an administrative complaint alleging that [Intuit's] advertisements *deceived* consumers into believing that all

TurboTax products are free" and "predicated [its allegations] on *Section 5 of the FTC Act*, which proscribes '*unfair or deceptive acts or practices*.'" *Id.* at xx (citing 15 U.S.C. § 45(a)(1)) (emphasis added) ); *see also* 15 U.S.C. § 45 (Addendum F). After suing Intuit in district court, the FTC instead pursued an administrative case, which resulted in a cease and desist order prohibiting Intuit from advertising goods or services as free unless it satisfied certain requirements. *Id.* at *1.

This case presents similar FTC allegations and desired relief that the agency seeks to internally adjudicate. In the FTC's administrative complaint against Asbury, the FTC alleges that Asbury "have charged consumers for add-ons they did not agree to and *misled* consumers into believing add-ons were required." ROA.145 (emphasis added). Additionally, the FTC alleges that Asbury "*falsely* represent[s] that consumers are required to purchase an optional add-on" and "have added unwanted add-ons to vehicle sales without consumers' knowledge or consent, or *misrepresented* that an add-on was required." *See* ROA.149-50 (emphasis added). Based on the foregoing, the FTC asserted violations of "*Section 5(a) of the FTC Act*, 15 U.S.C. § 45(a), [which] prohibits '*unfair or deceptive acts or practices in or affecting commerce*.'" ROA.152 (emphasis added). In fact, two counts in the complaint have the word "*misrepresentations*" in their titles. ROA.152.

Furthermore, the "Notice" attached to the complaint states that if the facts are found as alleged, it may be "necessary and appropriate" for the FTC "to seek relief to redress injury to consumers" and that "[s]uch relief could be in the form of restitution for past, present, and future consumers and such other types of relief as are set forth in Section 19(b) of the Federal Trade Commission Act." ROA.155. The "Notice of Contemplated Relief" attached to the complaint states that the FTC may order various forms of relief against Asbury, including, among others: "a. Prohibiting *misrepresentations* in connection with motor vehicles. b. Requiring obtaining *express, informed consent* for all charges in connection with motor vehicles. c. *Prohibiting charges* for any add-on that does not provide a benefit to consumers . . . j. Any other relief appropriate to correct or remedy the effects of Respondents' *deceptive* or unfair practices or of any or all of the conduct alleged . . . ." ROA.138 (emphasis added).

As is apparent, the FTC's claims in both administrative cases are claims of *deception*. And the potential relief would regulate Asbury's ability to contract with consumers just as the FTC circumscribed Intuit's ability to market its products and services. With regard to Asbury, the relief sought could be even more severe—it could include monetary sums.

2. Intuit*'s analytical framework squarely addresses Article III claims such as Asbury asserts here*.

In assessing Intuit's petition for review from the FTC's order against it, this Court wrote that "[Intuit's] threshold argument that [the] FTC unlawfully adjudicated '*private rights*' before an ALJ rather than in an Article III court proves dispositive." *Intuit*, 2026 WL 787527, at *2 (emphasis added). That is also Asbury's Article III claim—that the FTC is unlawfully attempting to adjudicate Asbury's private rights before an FTC ALJ instead of in an Article III court. So it is important to review this Court's *Intuit* interpretive framework.

As the Court noted, Congress may not "confer the Government's 'judicial Power' on entities outside Article III." *Id.* (citing *Stern v. Marshall*, 564 U.S. 462, 484 (2011)). The judicial power "'extend[s] to all Cases, *in Law and Equity*, arising under th[e] Constitution, [and] the Laws of the United States.'" *Intuit*, 2026 WL 787527, at *2 (citing U.S. Const. Art. III, § 2, cl. 1.) (emphasis added). Furthermore, "[w]hether a given claim falls within that scope turns on a longstanding distinction between 'public rights' and 'private rights.'" *Id.*

"The Supreme Court has explained that private rights are implicated by 'any [claim] which, *from its nature*, is the *subject of a suit at the common law, or in equity*, or admiralty.'" *Intuit,* 2026 WL 787527, at *2 (emphases added by the Court). Critically, "Article III extends beyond strictly 'legal' actions."

*Intuit,* 2026 WL 787527, at *2. "Claims that are naturally 'the subject of a suit at the common law, *or in equity*,' implicate private rights and thus fall under federal jurisdiction regardless 'whether they originate in a newly fashioned regulatory scheme or possess a long line of common-law forebears.'" *Id.* (emphasis added).

Although "[t]he concept of public rights has been somewhat nebulous," the Supreme Court emphasizes that the public rights doctrine is an extremely limited exception to Article III adjudication of private rights. *See id.* at *3-4. In fact, "despite uncertainty fostered by *Atlas Roofing* [*Co. v. Occupational Safety and Health Rev. Comm'n*, 430 U.S. 442 (1977)], Congress cannot relegate actions that were essentially 'suits at common law' to proceedings outside of Article III." *Intuit*, 2026 WL 787527, at *3 (citing *Granfinanciera SA v. Nordberg*, 492 U.S. 33, 56 (1989). Moreover, the Court noted that the Supreme Court has cautioned that the public-rights doctrine "'would swallow'" the ordinary Article III requirement "'[w]ithout . . . close attention to the basis for each asserted application.'" *Id.* at *4 (citing *Jarkesy*, 603 U.S. at 131, 144).

3. *This Court concluded that the FTC's allegations against Intuit invoked private rights—so the same is true in the present case.*

Utilizing the foregoing principles, this Court concluded that the FTC's "deceptive advertising claims under the FTC Act are 'in their nature' *traditional actions at law and equity* and thus involve private rights that demand

adjudication in an Article III court" in a way that demands a similar conclusion in this case. *Intuit*, 2026 WL 787527, at *4 (emphasis added). Initially, this Court instructed that a Section 5 deceptive advertising case requires proof that "a material representation 'was likely to mislead customers acting reasonably under the circumstances'" and emphasized that "[s]everal causes of action traditionally recognized by *courts of common law and equity* required a similar showing, including the torts of deceit and fraud." *Id.* at *4 (emphasis added)(citations omitted).

After undertaking a thorough recitation of the development of actions for fraud and deceit at common law and in equity beginning in the Eighteenth Century (*see Intuit*, 2026 WL 787527, at *5), this Court honed in on why FTC deceptive advertising claims were similar in their nature and therefore invoke Article III adjudication. As this Court wrote:

> Unlike . . . traditional actions, Section 5 deceptive advertising claims do not require FTC to produce evidence of damage and fraudulent intent. But the Commission still must show that reasonable customers were likely to be misled by a false representation. Here, the Commission alleged that Intuit falsely represented that TurboTax products were free, although they are free only for a narrow group of customers. These allegations correspond with the sine qua non of common law fraud and deceit: a material representation that was false. Hence, claims of fraud, deceit, and deceptive advertising share a common core.

*Id.* at *5. Building on that, this Court determined that "[s]triking similarities exist between FTC's administrative complaint and the Commission's opinion, on one hand, and classic terms of art associated with fraud and deceit." *Id.* The court explained:

> For example, [the] FTC alleged that Intuit "has engaged in, and is engaging in, *deceptive business practices* in the advertising, marketing, distribution, and sale of TurboTax," and "Intuit *baits* consumers with deceptive ads and then compound[s] the deception with more false claims and buried disclosures." *Intuit, Inc.*, 2022 WL 1044862, at *1, *5 (F.T.C. Mar. 28, 2022) (Comm'n Complaint) (emphases added) . . . .

*Id.* at *6. And pointing to the Supreme Court's reliance on "the similarities between SEC civil penalties and 'money damages,'" this Court noted that "the [FTC's cease and desist order] displayed the similarities between cease-and-desist orders and equitable remedies" and that courts have compared FTC Section 5 orders "to the traditional remedies that were available in courts of equity." *Id.*

Based on this framework, this Court ruled that "there is overwhelming evidence that Section 5 of the FTC Act did not create a new duty" regarding deceptive advertising and that the "duty long predated the FTC Act and could be enforced by private parties in actions at common law or equity for fraud, deceit, or unfair competition." *Id.* at *8. As a result, the FTC's action "(1) target[ed] the same conduct as traditional actions; (2) operate[d] pursuant

to similar principles; and (3) invoke[d] recognized terms of art" such that the FTC could not "contend that th[e] . . . matter [was one] in which 'the political branches had traditionally held exclusive power.'" *Id.* (citations omitted). "The close relationship . . . prove[d] that private rights [we]re at stake." *Id.*

As discussed *supra*, the FTC's allegations against Asbury are similar. The FTC alleges Asbury "*misled*," "*falsely represents*," "*mispresented*," and even included the word "*misrepresentations*" in two of the FTC's formal claims/counts and in its Notice of Contemplated Relief, as well as suggesting the agency may require Asbury obtain "*express, informed consent.*" ROA.156. For immediate comparison, in *Intuit* the FTC alleged that Intuit *falsely represented* matters and "*bait[ed]* consumers with *deceptive* ads and then compound[ed] the *deception* with more *false* claims and *buried* disclosures." *See id.* at *1, *6 (some of the emphasis added). Thus, the FTC Proceeding is very much about the same kind of fraud and deceit that this Court has found implicates private rights.

Moreover, it does not matter that this Court only "determine[d] [the] FTC's authority to adjudicate only deceptive advertising claims," and did "not decide the same question for any other 'unfair methods of competition' or other 'unfair or deceptive acts or practices.'" *Id.* at *10. First, this Court's historical analysis of fraud and deceit actions supporting its conclusions was

not limited to advertising. *Id.* at *4-7.[6] Second, the elements needed to prove both deceptive advertising and other deceptive acts under Section 5 of the FTC Act are the same:

> The FTC's claims are premised on the defendants' alleged violations of Sections 5 and 12 of the FTC Act. Section 5 of the FTC Act prohibits unfair or deceptive acts or practices in or affecting commerce. 15 U.S.C. § 45(a). Section 12 addresses false advertising and provides that the dissemination of false advertisements—defined as advertisements that are misleading in a material respect—is an unfair or deceptive practice in commerce. 15 U.S.C. §§ 52(b) and 55. "Thus, a violation of Section 12, dissemination of false advertising, constitutes a violation of Section 5(a)." *FTC v. QT, Inc.*, 448 F.Supp.2d 908, 957 (N.D.Ill.2006).
>
> To establish liability under Sections 5 and 12 of the FTC Act, the FTC must prove: (1) that there was a representation; (2) that the representation was likely to mislead customers acting reasonably under the circumstances; and (3) that the representation was material. *FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir.2003); *see also Kraft, Inc.*, 970 F.2d at 314 (citing Sections 5 and 12 to state that "an advertisement is deceptive under the Act if it is likely to mislead customers, acting reasonably under the

[6] *See also Doe v. Martin*, (1790) 4 TR 39, 66–67 (Lord Kenyon, C.J.) ("This then was a gross rank fraud, which . . . renders it absolutely void, as well in a Court of Law as in a Court of Equity.") (AD-3); *Earl of Chesterfield v. Janssen*, 28 Eng. Rep. 82, 100, 2 Ves. Sr. 125, 155 (1751) ("[Fraud] may be apparent from the intrinsic nature and subject of the bargain itself … which are unequitable and unconscientious bargains; and of such even the common law has taken notice ….") (AD-4); *Bath and Mountague's Case*, (1693) 3 Chan. Cas. 55, 74 (Lord Treby, C.J.) (explaining that the legal doctrine of Surreptio—"when a Man will by false Suggestions prevail upon another . . ."—is properly called "Fraud," and expressing "no doubt but Equity ought to set aside that") (AD-1). In fact, Congress categorically demonstrated a desire with the FTC Act to "superimpose[] a structure of Federal law" upon the existing fraud and deceit landscape. *See Holloway v. Bristol-Myers Corp.*, 485 F.2d 986, 989 (D.C. Cir. 1973). The FTC has admitted that FTC Act section 13(b)—that allows the FTC to seek injunctions in federal court—"was enacted" to augment the FTC's authority to "combat fraud." Br. for the FTC, *AMG Capital Mgmt. LLC v. FTC*, No. 19-508, 2020 WL 7093938, at *4 (U.S. filed Nov. 30, 2020).

> circumstances, in a material respect"); *QT, Inc.*, 448 F.Supp.2d at 957 (using this three part test to find violations of Sections 5 and 12).

*FTC v. Urological Group, Inc.*, 645 F. Supp. 2d 1167, 1188-89 (N.D. Ga. 2008); *see also FTC v. Direct Mktg. Concepts, Inc.*, 569 F. Supp. 2d 285 (D. Mass. 2008), *aff'd*, 624 F.3d 1 (1st Cir. 2010) (similarly setting forth the elements of proof for claims under Sections 5 and 12). Given these identical elements, the only logical conclusion is that the Court's *Intuit* analysis of private rights governs the FTC's allegations against Asbury.

The FTC's unfair competition claim against Asbury does nothing to alter the equation. The FTC complaint bases the unfair competition count on the same factual allegations. ROA.153. This is unsurprising since the Third Circuit has recognized that "facts relevant to unfairness and deception claims frequently overlap" and has suggested it can be difficult to "disentangle the two theories." *FTC v Wyndham Worldwide Corp.*, 799 F.3d 236, 245 (3rd Cir. 2105).

Moreover, this Court too has recognized the proximity of deceptive acts claims under the FTC Act to claims of unfair competition under that act. As this Court noted, it made "no difference" to its analysis "that the FTC base[d] its deceptive advertising claims [against *Intuit*] . . . on a separate phrase that Congress later added to the FTC Act for 'unfair or deceptive acts or practices,'

because "[t]he Wheeler-Lea Act . . . , which codified this addition, did nothing to sever the FTC Act" from its well-recognized roots. *Intuit*, 2026 WL 787527, at *6 n.7. Further, "courts observed in the years immediately following the FTC Act's passage in 1914 that its 'unfair methods of competition' standard was derived from the common law." *See id.* at *6; *see also Wyndham Worldwide*, 799 F.3d at 243 ("After several early cases limited 'unfair methods of competition' to practices harming competitors and not consumers, . . . Congress inserted an additional prohibition . . . against 'unfair or deceptive acts or practices in or affecting commerce,' [via the] Wheeler–Lea Act."). The FTC itself has acknowledged the close relationship of its unfair competition authority to its deceptive acts authority, on occasion describing "deception as a subset of unfairness." *See id.* at 245 n.4 (collecting authorities).

Accordingly, the FTC's fraud and deceit-based claims against Asbury, seeking to regulate its transactions with private parties (i.e., requiring obtaining "express, informed" consent for vehicle charges, prohibiting charges for add-ons, and other potential relief, including the extraction of monetary sums from Asbury), invoke private rights. *See Jarkesy v. SEC*, 603 U.S. 109, 135 (2024) ("The object of this SEC action is to regulate

transactions between private individuals interacting in a pre-existing market.”).

*4. The FTC’s counter-arguments have no merit.*

The FTC has offered various arguments against Asbury’s entitlement to Article III adjudication of the FTC’s claims against them. The arguments are all wrong in light of *Intuit*, *Jarkesy*, and other authorities.

Initially, the FTC construed *Jarkesy* as “a Seventh Amendment case [that] did not discuss how Article III applies in actions that do not implicate the jury right.” ROA.354. Setting aside the fact that the FTC Proceeding does implicate Seventh Amendment rights, that argument if made again would run straight into the framework and reasoning in *Intuit*: “*Following the Supreme Court’s decision in SEC v. Jarkesy*, we hold that adjudication of a deceptive advertising claim before an administrative law judge violated the constitutional separation of powers.” 2026 WL 787527, at *1 (emphasis added). The argument misreads *Jarkesy*, as the Supreme Court there confirmed “that the Constitution prohibits Congress from ‘withdraw[ing] *from judicial cognizance any matter* which, *from its nature*, is the subject of a suit *at the common law, or in equity*, or admiralty.’” *Jarkesy*, 603 U.S. at 128 (emphasis added).

The FTC also argued below that Article III somehow does not apply because the FTC Act’s “central purpose” was “to abolish the rule of *caveat*

*emptor*." ROA.353. But *Intuit* rejected the same argument and concluded that such a "technical distinction" fails to "disprove that private rights are at stake," as the Supreme Court in *Jarkesy* had "identified similar distinctions between federal securities fraud and common law fraud." 2026 WL 787527, at *7. Indeed, the FTC's argument actually highlights "Congress's decision to draw upon common law fraud." *Jarkesy*, 603 U.S. at 125. Congress intended to eliminate *caveat emptor* because it could be a defense to liability for "fraud and deception." *See FTC v. Standard Educ. Soc.*, 302 U.S. 112, 116 (1937). Congress's elimination of defenses made Section 5 claims "broader" in some respects than fraud claims, but that fails to diminish the "close relationship" between Section 5 claims and fraud claims. This Court explicitly recognized that relationship in *Intuit*:

> There is a significant difference between circumstances in which relief has been traditionally limited, or otherwise difficult to obtain, and those in which a claim is wholly unavailable, unrecognized by the common law, or unmoored from any kind of traditional action. Mere obstacles to relief do not compel the conclusion that there was no actionable wrong, and eliminating obstacles to relief does not make an actionable wrong no longer "traditional" in its nature.

*Intuit*, 2026 WL 787527, at *7; *see Jarkesy*, 603 U.S. at 125-26 (noting differences between securities fraud and common law fraud but still finding the two causes of action closely related).

The FTC's likely "public rights" arguments are similarly wrong. *Intuit, Inc.* blocks the FTC's argument that the type of proceeding it has asserted against Asbury is among "those identified by the Supreme Court as involving public rights." *Intuit*, 2026 WL 787527, at *4. Referencing as one example of such identified proceedings the Supreme Court's finding that public rights were involved in *Atlas Roofing*, this Court wrote:

> [A] blanket prohibition on "unfair deceptive acts or practices" does not remotely "resemble[ ] a detailed building code" like the workplace safety standards promulgated under the OSH Act . . . . Moreover, the Court emphasized that the "novel claims in Atlas Roofing had never been brought in an Article III court" . . . .. Not so here. Since the 1970s, the FTC Act has unambiguously authorized the Commission to prosecute Section 5 deceptive advertising claims in federal court . . . . "Beginning in the late 1970s, the Commission began to use . . . the words 'permanent injunction[ ]' to obtain court orders for redress of various kinds . . . without prior use of the administrative proceedings in § 5 . . . . [T]he Commission presently uses § 13(b) . . . with great frequency . . . ."

*Intuit*, 2026 WL 787527, at *7 (citations omitted).[7] Further, while "Congress can modify the common law and deal the public a better hand by expanding remedies," Congress cannot "relegate claims of common law pedigree to adjudication by non-Article III bureaucrats." *Id.* at *8.

[7] Notably, this Court stated that the Supreme Court has recently "cast doubt on whether *Atlas Roofing* remains good law." *Intuit*, 2026 WL 787527, at *4.

The foregoing makes sense because, as this Court recognized in *Intuit*, another way in which the Supreme Court's *Jarkesy* opinion is relevant to Article III claims is that it confirms the narrow nature of the "public rights" exception. Post-*Jarkesy*, the exception is limited to matters that "'historically could have been determined exclusively by [the executive and legislative] branches.'" *Jarkesy*, 603 U.S. at 112, 128. As this Court articulated it in a case involving the FCC, the Supreme Court "has . . . pointed to 'historic categories of adjudications' occurring outside Article III[:] . . . revenue collection, foreign commerce, immigration, tariffs, tribal relations, public lands, public benefits, and patents." *AT&T, Inc. v. FCC*, 149 F.4th 491, 500 (5th Cir. 2025)(citations omitted), *cert. granted*, No 25-406, 2026 WL 73092 (Jan. 9, 2026).

Even with respect to matters that "arguably fall within the scope of the 'public rights' doctrine, the presumption is in favor of Article III courts.'" *Id.* at 132. *Jarkesy* rejected the notion that the government's role in prosecuting an action is sufficient to implicate the public rights exception, as well as the notion that the "'constitutionally relevant distinction'" is whether the matter "'has been assigned to a federal agency to enforce.'" *See Jarkesy*, 603 U.S. at 135. "[W]hat matters is the substance of the suit, not where it is brought, who brings it, or how it is labeled." *Id.*

"Nor does the fact that [an] . . . action 'originate[d] in a newly fashioned regulatory scheme' permit Congress to siphon th[e] action away from an Article III court." *Id.* (citation omitted). Indeed, the Supreme Court "typically evaluate[s] the legal basis for the assertion [that rights are public] with care" because "[t]he public rights exception is, after all, an *exception*. It has no textual basis in the Constitution and must therefore derive instead from background legal principles." *Jarkesy*, 603 U.S. at 131 (emphasis in original).

Based on the foregoing guidance, this Court in *Intuit* correctly rejected key "public rights" cases the FTC has asserted, including before the district court. For example, the FTC argued that the Supreme Court identified the FTC Act as a paradigmatic "public rights" case in *Crowell v. Benson*, 285 U.S. 22, 50-51 n.13 (1932). ROA.382. This Court rejected *Crowell* as justifying the cease and desist proceeding in *Intuit* for essentially the same reasons Asbury argued below (*see* ROA.705-06):

> In *Crowell* . . . the [Supreme] Court approved administrative adjudication of disputes under the Longshoremen's and Harbor Workers' Compensation Act . . . . . In the course of explaining its conclusion, the Court cited one FTC case in a footnote as a "[f]amiliar illustration[ ]" of an administrative agency's adjudicating public rights . . . . The *International Shoe* case, however, concerned antitrust issues, not the scope of non-Article III adjudication. As Justice Gorsuch [has] pointed out [in his *Jarkesy* concurrence], "Crowell ... fell within federal courts' admiralty jurisdiction, and tribunals sitting in admiralty in England and America alike had long heard certain matters falling

> within the public rights exception" . . . . *Crowell* thus says very little to support FTC's administrative adjudication proceeding.

*Intuit*, 2026 WL 787527, at *9.

Other "public rights" cases the FTC cited to the District Court on Article III are similarly thin gruel. For instance, the FTC quoted dicta in *American Airlines v. North American Airlines*, 351 U.S. 79, 83, 85–86 (1956) that "the FTC Act does not 'vindicate private rights,' as the Act is concerned 'with protection of the public interest'. . . .'" *See* ROA.355, 395. But that decision did not adjudicate Article III. Indeed, even if an agency has some public rights role, not every proceeding brought by (or before) that agency's captive tribunal falls within the public rights exception as the exception turns on the rights at issue. In sum, *Intuit* and *Jarkesy* refute any attempt by the FTC to argue the FTC Proceeding against Asbury is a "public rights" matter.

### F. The district court used the wrong legal framework for analyzing Asbury's Seventh Amendment claim.

The district court erred in ruling that Asbury faced only "speculative injury" in connection with Asbury's Seventh Amendment claim. ROA.398. The court erred by almost entirely focusing its analysis on traditional standing case law as opposed to Seventh Amendment cases like *Jarkesy,* detailing when an agency is pursuing a claim at common law. Those cases demonstrate that the FTC is in fact pursuing claims at common law against

Asbury in the FTC Proceeding such that the Seventh Amendment is invoked, *despite* the FTC's inability to internally impose civil penalties.

*Both* the elemental nature of claims *and* remedies sought matter to the Seventh Amendment analysis. *Jarkesy* says so: "To determine whether a suit is legal in nature, we directed courts to consider the cause of action and the remedy it provides." 603 U.S. at 122-23. In fact, the Supreme Court has explicitly rejected that both the remedy and nature of the claim must be legal in nature to invoke a jury trial right: "The Government contends that both the cause of action and the remedy must be legal in nature" but the Court's "search is for a single historical analog, taking into consideration the nature of the cause of action *and* the remedy as *two important factors*." *Tull v. U.S.*, 481 U.S. 412, 421, n.6 (1987) (emphasis added).

As with Asbury's Article III argument that the FTC's claims are closely related to fraud and deceit actions in equity, so too are the FTC's claims closely related to fraud and deceit actions at common law. *See Intuit*, 2026 WL 787527, at *10 ("Caselaw from soon after the passage of the FTC Act reflects a widespread understanding that the statute encompassed common law actions for 'deceit,' 'fraud,' and 'unfair use'"). "Eighteenth-century English courts held that an action for deceit *lies at common law* whenever there is a 'false affirmation, made by the defendant with intent to defraud the

plaintiff, whereby the plaintiff receives damage.'" *Id.* at *5, 8; *see also* *Jarkesy*, 34 F.4th at 453-54 ("Fraud prosecutions were regularly brought in English courts at common law.").

Critically, the district court dismissed important language from *Jarkesy* that reinforces why the remedy an agency seeks is not singularly dispositive as to whether an action is akin to one at common law:

> The fact remains, though, that *the enforcement action* seeking penalties in this case *was one for securities fraud*, which is nothing new and nothing foreign to Article III tribunals and juries.
>
> That being so, *Petitioners had the right for a jury to adjudicate the facts underlying any potential fraud liability that justifies penalties*. And because those facts would potentially support not only the civil penalties sought by the SEC, *but the injunctive remedies as well*, Petitioners had a Seventh Amendment right to a jury trial for the liability-determination portion of their case.

*Jarkesy*, 34 F.4th at 456-57 (emphasis added). Given (a) the common law nature of the FTC's causes of action against Asbury, (b) that the FTC Proceeding could expose Asbury to a subsequent FTC suit seeking collection of civil fines—*see* 15 U.S.C. § 45(l), and (c) (Addendum F)—that courts have to give FTC fact findings deference,[8] Asbury is entitled to a jury to adjudicate

[8] Indeed, the Commission's findings are "conclusive" if supported by substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." 15 U.S.C. §§ 21(c), 45(c). Courts "must accept findings supported by evidence even if suggested alternative conclusions may be equally or even more reasonable and persuasive." *Impax Labs v. FTC*, 994 F.3d 484, 492 (5th Cir. 2021).

the underlying facts that would later be used as justification for seeking monetary sums. To conclude otherwise contradicts this Court's logic in *Jarkesy* and would allow Congress to severely undermine the Seventh Amendment by authorizing every agency to internally adjudicate claims whose elements are akin to those at common law and only save the recovery of penalties flowing from those claims for a judicial venue with a jury.

Finally, the cases the FTC cited to the District Court do not undermine the foregoing analysis. For instance, although post-Jarkesy, in *In re Abbott*, 117 F.4th 729 (5th Cir. 2024), this Court concluded *neither* the nature/elements of the claim at issue *nor* the remedies sought pointed to the common law. *See* 117 F.4th at 741.

### G. The district court disregarded a key structural deficiency undergirding Asbury's due process claim.

The district court dismissed Asbury's Fifth Amendment claim based upon *Illumina v. FTC*, 88 F.4th 1036 (5th Cir. 2023), and because it found no jurisdiction to consider Asbury's as-applied challenge. ROA.698-702, 706-07. However, the court erred as Asbury's facial challenge is also premised on the FTC's rules being structurally unfair to all parties, not just Asbury.

*Illumina* only precludes a "combination-of-functions theory," not a claim that the FTC's adjudicative rules are so inherently unfair that they deny

everyone a meaningful opportunity to rebut the agency's assertions. *See id.* at 1047. Asbury cited multiple instances of this inherent unfairness (ROA.123-26, 136-42, 801), including, for example, the fact that the FTC's rules require respondent parties to serve an expert report no later than a mere 14 days after the deadline for identification of complaint counsel's experts and service of complaint counsel's expert reports (16 C.F.R. § 3.31A). Requiring respondents to identify, retain, and have their experts review complaint counsel's expert reports[9] and, in addition, produce responsive expert reports—all in a mere 14 days—virtually insurers that respondents will fail. That alone demonstrates the FTC's rules deck is stacked.

Moreover, the district court's *Thunder Basin* analysis is no obstacle to consideration of the foregoing challenge. As a structural challenge, it presents here-and-now injury in the form of subjection to an unconstitutional adjudicative scheme. ROA.44-45, 125-28. Such a challenge is not meaningfully reviewable after the fact, is wholly collateral to the statutory review scheme since it does not challenge case-specific determinations, and falls outside the FTC's expertise because the FTC has no special competence to decide the constitutionality of its own procedures. *See Thunder Basin Coal Co. v. Reich*,

[9] In addition, it is reasonable to assume that when it initiates the administrative process the FTC has highly likely already retained their experts, in effect giving them months to prepare their reports.

510 U.S. 200, 212 n. 26 (1994); *Axon*, 598 U.S. at 194.

## III. *SPACEX* ESTABLISHES ASBURY WILL SUFFER IRREPARABLE HARM SANS AN INJUNCTION

*SpaceX* firmly confirms irreparable harm here. As this Court put it, the injury at issue there was "*Axon's* injury: the 'here-and-now injury' of 'being subjected to unconstitutional agency authority,'" and this Court ruled that "*that harm is irreparable*." *SpaceX*, 151 F.4th at 780 (emphasis added). This Court explained that the NLRB had tried to "cabin *Axon* to jurisdiction" but that *Axon's* "reasoning fits irreparable harm hand-in-glove: once an unconstitutional proceeding begins, the damage is done," and "[t]hat is *the essence* of irreparability." *Id*. (emphasis added). "No further showing—such as how the outcome might differ under a valid structure—is required." *Id*. (citation omitted). "Waiting until the end would be no remedy at all." *Id*. Accordingly, once this Court concludes that Asbury is likely to succeed on the merits, the irreparable harm issue is settled.[10]

---

[10] The FTC's attempts to evade *SpaceX* on this score are not at all persuasive. For example, before the district court, the FTC made the argument that "[b]ecause the Commission has repeatedly stayed the administrative proceeding and there is no indication it would be unwilling to grant further stays, Asbury cannot show it faces 'imminent' irreparable harm." ROA.835. This is a transparent attempt to end run around *SpaceX* and is belied by the FTC's own conduct. Indeed, the FTC has declined an indefinite stay of the FTC Proceeding pending a final and unappealable federal court ruling on plaintiffs' constitutional claims. If there is nothing for Asbury to fear here, the FTC should have no problem with an indefinite stay of the FTC Proceeding pending final resolution of Asbury's constitutional claims in federal court. Also, the FTC's case cites on this injunction element were odd. As just one example, the FTC cited a case where landowners sued a city alleging that its annexation of land was a "first step in a scheme undertaken . .

## IV. *SPACEX* CONFIRMS THAT THIS RECORD ESTABLISHES THE FINAL TWO INJUNCTION ELEMENTS.

This Court has left no doubt that Asbury meets the final two injunction elements. Initially, "those two factors 'merge when the Government is the opposing party.'" *SpaceX*, 151 F.4th at 780. In cases such as this one that present structural constitutional infirmity:

> The Government suffers no cognizable injury when a court halts unlawful agency action. Nor does the public interest suffer when an unlawful agency structure is prevented from subjecting "countless individuals and companies" to unconstitutional proceedings. To the contrary, "the public is served when the law is followed." And the public is disserved when "accountability" evaporates because "a person or entity other than Congress exercises legislative power."

*Id.* Indeed, as the Court put it in *SpaceX*, the equities in circumstances such as are present here tip "sharply" against the FTC. *See id.*

In an attempt to evade this Court's direction—see *SpaceX*, 151 F.4th at 780-81—the FTC argued below that "the [FTC] administrative proceeding is not simply a matter of enforcing a legal technicality," and that it instead

. to deprive them of property without just compensation, either by unlawful zoning ordinances or [later initiated] eminent domain proceedings . . . ." *Chacon v. Granata*, 515 F.2d 922, 923 (5th Cir. 1975). In that case, this Court unremarkably commented that *the city had passed no applicable zoning ordinances*, legislative bodies are presumed to act with regard for constitutional rights, and it could not be foreseen how any ordinances would be drafted or applied. *Id.* at 925 (emphasis added). The Court thus found that "the injury plaintiffs fear about *potential future* zoning ordinances is not imminent." *Id.* (emphasis added). The circumstances in *Chacon* are vastly different from this case—here, the FTC has, in fact, instituted an illegitimate proceeding against plaintiffs that *remains pending*.

"implicates important equities concerning consumer welfare." ROA.857. But the NLRB and other agencies against which injunctions have been granted due to constitutional infirmities in their process also address important issues of consumer, public or labor welfare. Indeed, in two of the three injunctions the Fifth Circuit affirmed in *SpaceX*, the unfair labor practices charge of a single employee—rather than systemic issues—supported an injunction. *See id.* at 768-69; *see also Wulferic LLC v. FDA*, 793 F. Supp. 3d 830, 851 (N.D. Tex. 2025) (rejecting FDA's contention that its regulatory scheme was "designed to promote the public interest" and concluding that the FDA's interest was "outweighed, if not negated, by the deprivation of [the company's] Seventh Amendment rights").

None of which is to mention again that the FTC can enforce its claims against Asbury in a federal court. The FTC simply does not have such a unique role that the Court should accept its equities claims here. It is not a unicorn agency. In fact, unlike the FDA, the FTC has no such preemptive role because each state has a co-equal consumer protection enforcement role. *See* https://thelaw.institute/consumer-protection-issues/consumer-protection-laws-usa-overview/ (last visited on April 13, 2026) ("While federal laws establish baseline protections, state governments play a crucial role . . . . Each state has its own consumer protection laws, often modeled

after the federal FTC Act but sometimes providing stronger protections.”).

The cases the FTC cited below on the last two injunction elements do not negate *SpaceX*. For instance, in one case cited—*SO Apartments, LLC v. City of San Antonio*, 109 F.4th 343 (5th Cir. 2024)—apartment complexes sought an injunction on constitutional grounds, complaining about fines and inspections that a city imposed in connection with property maintenance codes. Regarding the “balance of harms between the Complexes and the City and its Residents,” this Court concluded the complexes had not met their burden since the potential harm was “monetary in nature and thus reparable” while the City would be prevented from exercising police powers. *Id.* at 352. The harm that Asbury faces here is irreparable harm, as it involves a “here and now” injury of subjection to a decisionmaker and process that are unlawful.

## Conclusion

Plaintiffs ask that this Court reverse the temporary injunction order; render an injunction enjoining the FTC from adjudicating the matters in the FTC Proceeding until a trial on the merits; and award costs.

Respectfully submitted,

*/s/ John Sepehri*

Edward D. ("Ed") Burbach
John Sepehri
Brandon M. Livengood
Foley & Lardner LLP
600 Congress, Suite 3000
Austin, Texas 78701
Tel: 512.542.7000
eburbach@foley.com
jsepehri@foley.com
brandon.livengood@foley.com

Stacy R. Obenhaus
Foley & Lardner LLP
2021 McKinney, Suite 1600
Dallas, Texas 75201
Tel: 214.999.3000
sobenhaus@foley.com

Counsel for:
Asbury Plaintiffs-Appellants

# Certificate of Compliance

This document complies with word limits of Federal Rule of Appellate Procedure 32 because, excluding the parts of the document Rule 32 exempts, this document contains **12,507** words in accordance with Federal Rule of Appellate Procedure 32.

This document complies with typeface requirements of Rule 32(a)(5), and the type-style requirements of Rule 32(a)(6), because this document was prepared in proportionally spaced typeface using Microsoft® 365 software in Georgia 14-point font.

*/s/ John Sepehri*
John Sepehri